Argued and submitted April 7, affirmed August 6, 2003

In the Matter of
Curtis Leroy Akers, a Minor Child.

STATE ex rel JUVENILE DEPARTMENT
OF JACKSON COUNTY,
*Respondent,*

*v.*

CURTIS LEROY AKERS,
*Appellant.*

00 0420 J; A114139

74 P3d 1118

William N. Kent argued the cause and filed the brief for appellant.

Stacey RJ Guise argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

LANDAU, P. J.

## LANDAU, P. J.

The juvenile court found that youth was within its jurisdiction under ORS 419C.005 for having committed acts that, if committed by an adult, would have constituted sodomy in the first degree and sexual abuse in the first degree. ORS 163.405; ORS 163.427. Youth appeals, arguing that the state failed to prove beyond a reasonable doubt that he committed those acts. We review *de novo*, giving due deference to the credibility determinations made by the juvenile court, to determine whether the state has proved each of the acts alleged beyond a reasonable doubt. ORS 419A.200; *State ex rel Juv. Dept. v. Evans*, 171 Or App 611, 613, 15 P3d 1003 (2000). We affirm.

The record reflects the following facts. At the relevant time, youth was 13 years old and the victim, D, was 5 years old. Youth's and D's families lived next door to each other in a mobile home park. Youth's mother babysat for D in her own home several days a week.

In June 2000, while D's mother was bathing him, D disclosed to her that, while he was at youth's mother's house, youth had pulled down D's shorts and "started sucking on his pee pee." The next day, D's mother told youth about D's disclosure and told youth to stay away from D. Youth did not respond. Later that same day, youth and his mother went to D's house where, in the presence of both mothers, youth asked D, "Why are you saying this?" and "Why are you lying?" D stated that he was lying. Over the following week, D's mother repeatedly told D that he "needed to tell the truth" about the incident. At the end of the week, D told his mother that the abuse had, in fact, occurred.

D's mother reported the abuse to the authorities. In July 2000, Oregon State Police Detective Bedell interviewed D; the interview was videotaped. In August 2000, Bedell interviewed youth; youth denied that he had touched D's private parts. In August and September 2000, D participated in two sessions with Toni Richmond, a therapist at the Child Advocacy Center in Jackson County; the sessions were not recorded.

The juvenile department petitioned for juvenile delinquency jurisdiction over youth, alleging that youth had committed an act that would constitute sodomy in the first degree by engaging in deviate sexual intercourse with D and that youth had committed an act that would constitute sexual abuse in the first degree by subjecting D to sexual contact, specifically, by touching D's penis. Evidence at the adjudicatory proceeding included the testimony of various witnesses, including D, and the videotape of Detective Bedell's interview with D. Youth did not testify at the hearing.

D, who was still five years old at the time of the hearing, testified that he knew youth and youth's mother and that youth's mother used to babysit for him. He testified that youth had "sucked my private parts" and that youth had put his mouth on D's "pee pee." D explained that the incident occurred while youth's mother was "[d]own waiting for the mail"; that he and youth were in youth's bedroom and that, before it happened, they were "[j]ust wrestling"; and that it happened only one time. D testified that it was "[r]eally important" that he tell the truth in the hearing. When asked whether he had ever told a lie, he responded, "Yeah, just a couple." D denied ever telling a lie about youth, however.

D's mother testified that D had learned to name his body parts at a Head Start program, where they also focused on "safe touching and bad touching." She testified that D was "not exposed—exposed to any—any pornography or anything like that at the house" and that, prior to his disclosure, she had never heard him refer to "sucking a pee pee." As to D's statements about the abuse, D's mother testified that his demeanor at the time of his initial disclosure was "[s]cared, confused," and that, after D recanted,

> "I just kept bringing up the importance of telling the truth, you know, that if * * * [t]hat if [youth] did do it, you know, that he—he needed to tell the truth, you know. I had—I always had that in the back of my mind, I knew [D] was telling me the truth. I never stopped believing him."

She also testified that, when D retracted his recantation, "He told me that he had seen how upset everybody was and that

[youth] had gotten in trouble and that that's why he had said that, why he had [recanted]."

Richmond, the therapist who saw D twice in August and September 2000, testified that much of the information that she obtained in her visits, including D's medical and developmental history and information about his current behavioral problems, was obtained from D's mother. Richmond testified that, when she asked D in the first session if he knew why he was at the center, he responded, "I need help. A boy tried to pick me up and jam me on the ground"; he did not mention the abuse during that session. In the second session, D told Richmond that youth had "touched him on his pee pee with his mouth." Richmond believed that D was "really clear about what had happened." She also believed that her observations of D were "generally pretty normal." Richmond recommended that D receive group therapy.

Bedell testified at the hearing that, in her interview with youth, in addition to denying the abuse, youth also offered an "alternate explanation" for D's allegation: Youth thought that D was "making the allegation up because [D] wanted to get someone into trouble. And then [youth] also offered an explanation where [D] may have been asked by another neighbor boy to make up the story about [youth] to get [youth] in trouble."

Several witnesses testified regarding D's reputation for truthfulness. Karen Bogle, D's current kindergarten teacher; David Kidgell, the onsite manager of the mobile home park at the time of the alleged incident; and Susan Ruth, D's daycare provider after D stopped going to youth's mother's house, all testified that D was generally truthful. Barth and Holmes, two children who lived in the mobile home park, testified that they had heard D tell lies; Holmes also testified that he had witnessed D stealing things and that, after D made his allegation against youth, when the subject of youth came up, D seemed "proud" of "it." Four adults and one child testified that D had threatened in various ways to "tell his mom." One of the adults, Kenton, testified that D threatened to tell his parents that Kenton "did

bad things"; another adult—youth's stepfather, Price—testified that D threatened to tell his mother that "you did something"; and a third adult, Joan Andrews, who was a former manager of the trailer park, testified that she had heard D tell another person, "If you don't let me go [into the other person's residence] I'll go tell my mom you did something to me."

A sixth-grader at youth's middle school, Maxwell, testified that he had known youth for "four or five" years and that, in mid-October 2000, youth approached him in the school building and said something to the effect of, "[Y]ou know, this is kind of stupid. If [D] did not want me to do this to him why didn't he just say no?" Maxwell testified that youth also said something to the effect of, "I hope you don't believe this because this would really like interfere with our friendship." Maxwell also testified that, a week or two later, he heard youth talking to other people at school about the incident.

A child witness, Holmes, and four adult witnesses—youth's mother, his father, his stepfather, and Kidgell—testified that youth was generally truthful.

Youth's mother testified at the hearing that, for two weeks after D made the allegation against youth, he continued to come to her house for daycare at his regularly scheduled times and that she noticed no difference in the way he acted. Ruth, D's daycare provider, testified that she previously had been D's babysitter for almost five years, that he was almost like a member of her family, and that, after D returned to her care, he engaged in various forms of misbehavior including breaking toys and knocking another child down; she also testified that, as of the time of the hearing, he had "gradually gotten better."

We turn to the videotaped interview, also entered into evidence, and to the testimony of youth's expert regarding the interview and other matters. In the interview, Bedell asked D what he called various body parts. D responded that he called his penis his "pee pee" and the part he sat on his "butt." Later in the interview, Bedell asked D "what do you think a good touch might be" and what might be a "bad

touch." D responded that a "good touch" might include shaking hands, hugging, and kissing, and that a "bad touch" might be hitting, punching, kicking, and tripping people. Bedell also asked D if he knew what a "secret touch" might be; D answered that it might be "touching really really gentle." The detective explained to D, "Sometimes what we call secret touches is when a * * * person touches us on our private parts, and we don't like it * * * the pee pee or the butt and they might ask you to keep it a secret." She asked him, "Do you know anybody that gives those kind of touches?" D responded, "No." Bedell said, "No? Has anyone ever touched you on your private parts?" D again responded, "No."

Later in the interview, Bedell asked D why he no longer went to youth's mother's house. The following exchange occurred:

D: "Because my mom said. And I have to listen to my mom."

Bedell: "Yeah. That's a good idea. I had to listen to my mom too. Why don't you think your mom wants you to go there any more?"

D: " 'Cause she said we don't go there."

Bedell: "Did she tell you why though?"

D: " 'Cause somebody touched my private part."

Bedell: "Okay. Who was that?

D: "[Youth.]"

Bedell: "Okay. What private part did [youth] touch?"

D (gesturing): "Right here."

Bedell: "What do you call that?"

D: "Pee pee."

Bedell: "What did [youth] do to your pee pee?"

D: "Sucked it."

Bedell: "Why did he do that?"

D: "We were wrestling. [Pause.] I told the truth to my mom."

Later, Bedell also asked D how it made him feel when youth sucked his "pee pee." D responded, "Sad." When Bedell asked why it made him feel sad, D responded, "Cause he did that and my mom feels sad."

At the hearing, youth called as an expert witness a psychologist, Dr. Johnson, who testified regarding Bedell's interview of D and other information in the record. As to the Bedell interview, Johnson testified that it was important to note that the interview was being conducted by way of "specific questions being asked eliciting specific responses," rather than by "what would be generally described as a more free recall technique." He indicated that the former technique was inherently somewhat more "suggesting and/or leading" and that the latter was "a preferable method." Johnson also noted that, after D initially denied that he had experienced any "secret touch or having his private parts touched," Bedell "asked twice in a different way, became more specific * * * which is not again uncommon, particularly if you have in mind where you're going with the interview, that is you expect to find it."

Johnson also testified that it was unclear to him that D's responses to questions as to why he no longer went to youth's mother's house and as to how he felt about youth sucking his pee pee constituted what Johnson characterized as a "specific independent recollection" that was "outside of the context from what he has been told from his mother." Johnson testified that that distinction was critical, particularly in light of D's emotional link to his mother and the fact that, after he recanted his initial accusation, his mother "somehow communicat[ed] to him that she did not accept" his recantation. Johnson also opined that Bedell had reinforced D's statement that youth had sucked his "pee pee" by repeating that phrase in other questions and that another of Bedell's questions—asking D how youth could have sucked his pee pee if D had shorts on—suggested its own answer.

Johnson also testified that he had reviewed the report of the mental health evaluation prepared by Richmond. Johnson believed that the report involved a "presumption" that the abuse had occurred. Johnson explained that such a presumption, as well as other methods used by

Richmond in assessing D, were acceptable in the context of determining treatment but not for forensic purposes. Johnson also noted that Richmond's observations lacked "points of comparison" with a "normal child" or with D's behavior before the alleged incident.

Johnson also testified that youth's reported statement to Maxwell that, "[i]f D did not want me to do this to him, why didn't he just say no?" could be considered an admission combined with a "justification" if the statement were made in a certain way, but that youth's statement to the same acquaintance that "I hope you don't believe this because this would really like interfere with our friendship" was inconsistent with considering the former statement as an admission.

Johnson conceded that D's initial report to his mother was a spontaneous statement and that such statements typically are viewed as more "creditable * * * than statements that would be the result of a series of interviews"; however, he also believed that a spontaneous statement is "not conclusive." Johnson agreed that knowledge about "sucking a penis" would not be within the sexual knowledge of an average five-year-old. Johnson believed that it was a "hypothesis that needs to be entertained" that D originally recanted due to pressure from youth; he noted, however, that D's mother also was present at the time D recanted, "so there's other dynamics, possibly, at work."

Johnson testified that, based on his training and experience, a "creditable" determination of whether abuse actually occurred could not be made based only on the video-taped interview with Detective Bedell. He also believed that it would be "extremely difficult" to make such a determination based on the combination of the police reports, witness statements that had been provided to him, Richmond's mental health assessment, and the videotape of Bedell's interview—including information about D's spontaneous disclosure of the abuse—because of the lack of a "comprehensive forensic evaluation" of either D or youth. Johnson noted in particular the lack of information about the "kind of communication" D was subjected to "in the interim" between the abuse and the reporting of it; the inconsistencies raised by

D's recantation and later reaffirmance of the abuse; the "multiple" contacts over a "period of months" between D and various investigators; and the resulting uncertainty as to whether D's statements regarding the abuse were contaminated.

The trial court found beyond a reasonable doubt that the alleged abuse had occurred, assumed jurisdiction over youth, and placed him on probation.

In his sole assignment of error on appeal, youth argues that the state failed to prove beyond a reasonable doubt that the alleged abuse incident occurred. Specifically, youth contends that, because he denied to Bedell that the abuse occurred, the state's case turned entirely on the credibility of the victim and that D's credibility was suspect for various reasons: because of the "pattern of inconsistency" and lack of independent recollection in his statements, as noted by Johnson; because of the possible contamination of his statements due to his mother's insistence that he "tell the truth" and due to the methods used in Bedell's and Richmond's interviews; because of the testimony of several witnesses that, on various occasions, D had lied and threatened to get people into trouble; and because there was no evidence that D was upset or affected by the alleged abuse. Youth contends that, in light of those circumstances, D's single spontaneous statement regarding the abuse simply is not enough to constitute proof beyond a reasonable doubt.

The state agrees that this case turns on credibility and urges us to defer to the juvenile court's implicit finding that D's account of the incident was credible. The state argues that D's only "inconsistency" was his recantation, which, according to the state, was made under the pressure of the confrontation with youth. The state also argues that D's initial disclosure was an "independent recollection," that the disclosure related to an act outside the normal knowledge of a five-year-old, and that testimony that D was truthful was sufficient to offset other testimony that D lied or threatened to get people into trouble.

On *de novo* review, giving deference to the trial court's credibility determinations, *Evans*, 171 Or App at 613, we find beyond a reasonable doubt that youth committed the

abuse. In particular, we give significant inculpatory weight to D's initial spontaneous disclosure of the abuse and to youth's statement to Maxwell to the effect of, "If [D] did not want me to do this to him why didn't he just say no?" Unlike evidence relating more generally to D's truthfulness or untruthfulness or to the adequacy or inadequacy of the investigation in this case, that evidence relates to the specific incident and conduct at issue here. Also, as to D's spontaneous disclosure, youth's own expert testified regarding the relative "creditability" of such evidence.

Conversely, to the extent that D also made inconsistent statements about the incident, those statements appear to be explicable by the situations in which they were made, such as the confrontation with youth that led to D's recantation and, in the context of D's initial denial to Bedell that anyone had ever touched his pee pee, the fact that most of the other examples of "touching" that he and Bedell had just identified involved touching with hands, not the mouth.

Finally, notwithstanding Johnson's opinion of the investigatory techniques used in this case, we do not regard the investigation as described and represented in the record—including Bedell's videotaped interview with D—as having unduly contaminated the evidence.

Affirmed.